1
2
3
4
5
6
7

United States District Court
For the Northern District of California

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12

13

14

15

16

17

18

| | |
|---|---|
| ORACLE AMERICA, INC., | ) Case No.: 5:11-CV-01043-LHK |
| Plaintiff, | ) and related case 11-CV-02135-LHK |
| v. | ) |
| | ) CORRECTED ORDER GRANTING IN |
| INNOVATIVE TECHNOLOGY | ) PART AND DENYING IN PART |
| DISTRIBUTORS LLC, | ) ORACLE AMERICA, INC'S MOTION |
| | ) FOR SUMMARY JUDGMENT |
| Defendant. | ) |
| | ) |
| | ) |

19

Before the Court is Oracle America, Inc.'s ("Oracle")[1] Motion for Summary Judgment

20

pursuant to Federal Rule of Civil Procedure 56 ("Motion"). 11-CV-01043-LHK, ECF No. 155.

21

This case arises from Oracle's termination of an agreement between Innovative Technology

22

Distributors, LLC ("ITD")[2] and Oracle's predecessor company, Sun Microsystems ("Sun"),

23

relating to the sale of Sun's products. Having considered the parties' submissions, the relevant

24

case law, and the parties' arguments at the August 23, 2012 hearing on this matter, the Court

25

GRANTS IN PART and DENIES IN PART the Motion.

26
27
28

---

[1] Oracle is the Plaintiff in Case No. 11-CV-01043-LHK and the Defendant in Case No. 11-CV-02135-LHK.
[2] ITD is the Defendant in Case No. 11-CV-01043-LHK and the Plaintiff in Case No. 11-CV-02135-LHK.

# I.     FACTUAL BACKGROUND

## A.     Innovative Technology Distributors, LLC

ITD is a "value added reseller[]" of technology products.  Declaration of Robert S. Friedman in Support of Motion for Summary Judgment ("Friedman Decl."), Ex. 27.  It was formed in 2005 by Linda Spinella, Gloria Mellina, Karen Vogelzang, Rosemary Conway and "Ms. Batula" (all of whom were the wives of executives and board members of another technology company, ISD).  Friedman Decl., Ex. 16 (L. Spinella Dep. Tr.) at 23:4-14, 24:21-25:15; *Id*., Ex. 27.  ITD is a woman-owned business and a diversity supplier.  Friedman Decl., Ex. 16 (L. Spinella Dep. Tr.) at 24:8-9; Ex. 33 at ITDIST0176755.

While there is some dispute as to the reasons for ITD's formation (*see* Motion at 4; Opposition at 3), ITD appears to have been formed to take advantage of an opportunity to become a supplier of Sun products for Alcatel-Lucent ("ALU"), a prominent network equipment provider. *See* Friedman Decl., Ex. 16 (L. Spinella Dep. Tr.) at 20:23-21:17, 24:8-12; Ex. 27.  ALU needed a supplier that was: (1) capable of providing certain enhanced supply chain management services ("dock-to-shop services"), and (2) a woman-owned enterprise.  *See* Friedman Decl., Ex. 16 (L. Spinella Dep. Tr.) at 20:23-21:17, 24:8-12.  ITD met both requirements.

## B.     ITD's Relationship with Sun

### 1.     The Sun Agreement

Consistent with its purpose of supplying ALU with Sun products, in June 2005, shortly after ITD's formation, ITD entered into an agreement with Sun to become a Sun Partner ("Sun Agreement").  *See* Declaration of Vincent James Spinella ("Spinella Decl."), Ex. B.  The Sun Agreement consisted of two main documents: (1) the General Terms, and (2) the iForce Business Terms Exhibit.  *Id*.  For the purposes of the instant motion, several provisions of these documents are worth noting:

First, Section 9.1 of the General Terms provides that "[a]ll disputes will be governed by the laws of California" and that "[c]hoice of law rules of any jurisdiction will not apply to any dispute under the Agreement."   Friedman Decl. Ex. 30, General Terms § 9.1.

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Second, the General Terms also provide that "[n]either the General Terms nor any

2   Agreement is intended to create a… franchise… relationship," Spinella Decl., Ex. B., General

3   Terms § 9.4.

4   Third, the iForce Terms agreement provide that "[e]ither party may terminate this Exhibit at

5   any time upon ninety (90) days written notice."  Spinella Decl., Ex. B., iForce Terms § 11.1(a).

6   Fourth, the iForce agreement strictly limits ITD's use of Sun's trade names.  Specifically,

7   Section 12.1 provides that "[ITD] is granted no right, title or license to, or interest in, any Sun

8   Trademark."  Spinella Decl., Ex. B, iForce Terms § 12.1.  Section 12.2 further states that ITD only

9   has "*limited, non-exclusive*… permission to use… Sun['s] logo… to refer or relate to Sun's

10  program for [ITD's] Partner Type…" *Id.*, § 12.2 (emphasis added).  Additionally, while the

11  agreement permits ITD to display Sun's logo "in pre-sale advertising and marketing materials," it

12  is prohibited from displaying the logo on "product, packaging, documentation… or other materials

13  distributed with Products or the rendering of Services." *Id.*, § 12.2(b).  Moreover, any pre-sale

14  advertising and marketing materials displaying Sun's logo also had to "prominently display

15  [ITD's] own corporate name and logo…." *Id.* § 12.2(b).

16  Fifth, Section 4.2(e) of the iForce Terms stated that ITD could dispute an order within 15

17  days of receiving the invoice from Sun.  Spinella Decl., Ex. B, iForce Terms, § 4.2(e).  If a dispute

18  was raised within the specified time, ITD was not responsible for paying the outstanding invoice

19  until the dispute was resolved. *Id.*

20  Significantly, the Sun Agreement did not require ITD to sell Sun's products exclusively.

21  *See* Spinella Decl., Ex. B; *see also* Declaration of Valerie Wagner in Opposition to Oracle

22  America, Inc.'s Motion for Summary Judgment ("Wagner Decl."), Ex. D (Young Dep. Tr.) at

23  118:8-10 (stating that ITD was not an exclusive reseller of Sun products).

24  **2.   ITD's Business Model and Sale of Sun Products**

25  After the execution of the Sun Agreement, ITD began selling Sun's products.  As a value

26  added reseller, ITD operated by pairing these products with its own "value added" products and

27  services.  Wagner Decl., Ex. G at ORCL00649835-37.  ITD's value added products and services

28

3

1    included, *inter alia*, inventory and logistical support, customization of Sun's services and products,

2    and product and supply chain management.  *Id.*; Spinella Decl., ¶ 2.

3        While there was no contractual requirement that ITD limit itself to the sale of Sun products,

4    it, nevertheless, sold Sun's products almost exclusively.  For example, in 2005, 100% of ITD's

5    revenues were generated by its sale of Sun products.  Spinella Decl. ¶ 6.  Similarly, in 2006, 2007,

6    2008, 2010, and 2011, ITD's revenues from Sun products accounted for 99.86%, 61.83%, 77.22%,

7    95.15%, and 96.09% of its total revenues, respectively.  Spinella Decl. ¶ 6; Wagner Decl., Ex. D

8    (Young Dep. Tr.) at 118:11-14 (stating that the "vast majority" of products that ITD sold were

9    Sun/Oracle products).

10       The pairing of ITD's services and Sun's products proved to be a particularly attractive

11   combination to potential customers.  Dennis Young, a former Sun/Oracle executive, stated during

12   his deposition that ITD's services were a "huge competitive differentiator for" Sun and helped

13   produce "[h]uge" increases in Sun's sales.  Wagner Decl., Ex. D (Young Dep. Tr.) at 125:1-6,

14   125:21-22.  For example, Sun was able to "leverage" the additional services that ITD provided to

15   "win new OEM design [projects] with Alcatel-Lucent and Motorola."  *Id.* at 125:1-6.

16       Despite enjoying a highly profitable relationship with Sun, ITD did, at certain times,

17   consider selling Sun's competitor's products, specifically products manufactured by Hewlett

18   Packard ("HP").  *See* Friedman Decl., Ex. 42 (HP Business Plan dated February 2010).  ITD

19   appears to have considered this option in response to requests by its two largest customers, ALU

20   and Motorola, that ITD supply HP's products in addition to Sun's.  *See* Friedman Decl., Ex. 15

21   (Spinella Dep. Tr.) at 666:12-19.  Notably, however, ITD did not actually begin selling HP

22   products until after the termination of the Sun Agreement.  Friedman Decl., Ex. 13 (Spinella Dep.

23   Tr.) at 100:18-101:15 (stating that, prior to September 2011, ITD did not engage in any significant

24   sales of HP products).  ITD's reluctance to sell HP products earlier appears to have been due, in

25   part, to its concerns about jeopardizing its relationship with Sun.  *See* Wagner Decl., Ex B at

26   104:20-105:11; Friedman Decl., Ex. 28 (stating that, while ITD was exploring the possibility of

27

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

1  joining HP's reseller program, ITD did not have a contract and still considered its relationship with

2  Sun to be its "highest… priority").

3      **3.**     **ITD's Marketing of Sun's Products and Use of Sun's Trade Name**

4        In conjunction with its sale of Sun products, ITD engaged in certain marketing activities

5  relating to those products.  Spinella Decl. ¶ 12.  These activities included sending out targeted e-

6  mails, as well as mailing brochures and other literature.  *Id.*  ITD also created promotional items,

7  including banners, t-shirts, and brochures.  Many of these items featured Sun's name and logo;

8  however, pursuant to the Sun Agreement, Sun's logo was always accompanied by an equally

9  prominent ITD logo.  *See* Spinella Decl., Ex. F; *see also Id.*, Ex. B, iForce Terms § 12.2(b) (stating

10  that "pre-sale advertising and marketing materials" bearing Sun's logo must also "prominently

11  display [ITD's] own corporate name and logo").

12        In addition to distributing literature and creating promotional items, ITD constructed a

13  "demonstration facility" for Sun's products at its Edison, New Jersey office.  Spinella Decl. ¶ 24.

14  The demonstration facility contained signs describing Sun's products and included special racks

15  that organized the cables connecting Sun's equipment so that customers could see how the cables

16  were laid out.  *Id.* ¶ 25.  Additionally, a Sun banner was displayed.  *Id.*  Over the course of Sun and

17  ITD's relationship, numerous customers visited ITD's demonstration facility.  *Id.* ¶ 26-27.

18        ITD has also presented evidence that it engaged in certain joint marketing efforts with Sun.

19  As set forth in James Spinella's declaration, Sun and ITD made joint marketing presentations to a

20  number of customers including Nokia-Siemens, ALU, AT&T, and Huawei.  Spinella Decl. ¶ 8, 10,

21  28; *Id.* ¶ 11 (describing account planning session with 30 to 40 representatives from Motorola,

22  ITD, and Sun).  The companies also jointly entertained certain customers, including taking them to

23  dinners, golf outings, and sporting events.  *Id.* ¶ 11.

24      **4.**     **ITD's Investments in Its Business with Sun**

25        In addition to selling and marketing Sun's products, ITD made a number of investments

26  relating to its business with Sun.  For example, as a Sun Partner, ITD was required to invest

27  resources to ensure that its staff was knowledgeable about presale, sale, and post-sale tasks, as well

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

as "sizing, configuring, integrating, and delivering services on Sun Products…."  Spinella Decl., Ex. D at ORCL00903417-21.  ITD was also required to hire specialized staff, including a "technical architect," who was responsible for designing, "deploy[ing,] and integrat[ing] Sun products…."  *Id.* at ORCL00903404; Spinella Decl., ¶ 21 (stating that ITD was required to employ individuals with ISO and TSO certifications, individuals who were trained in product assembly, and individuals trained to place orders on Sun configurations).  As recognized by Mr. Young during his deposition testimony, ITD's investments in acquiring the necessary knowledge, skills, certifications, and human resources were "significant."    Spinella Decl., Ex. D (Young Dep. Tr.) at 114:1-115:12; Spinella Decl., ¶ 21 (noting that ITD spent approximately $330,000 on Sun related trainings and certifications).  Moreover, the knowledge that ITD acquired was not useful with respect to products manufactured by Sun's competitors.  *Id.* (noting that ITD's knowledge of Sun products was not transferrable to HP products).

ITD also constructed an 18,000 square foot "integration facility" in anticipation of a $100 million dollar integration deal.  Spinella Decl. ¶ 16.  Notably, after the termination of the Sun Agreement, ITD was able to repurpose this facility to use HP products at "no additional cost."  Friedman Decl., Ex. 6 (Browne Dep. Tr.) at 65:24-66:9; *Id.*, Ex. 37 (ITD 2011 Business Plan for HP) (stating that ITD's "software development, hosting, integration and professional services… could be readily transitioned to focus on HP and IBM.").

Additionally, ITD invested $1 million dollars in a Sun/Oracle specific inventory database and a Sun/Oracle specific warehouse management platform.  Spinella Decl. ¶ 14.  ITD also invested substantial sums in "loaner" equipment that was placed at customer's facilities to generate more interest in Sun's products.  Spinella Decl., ¶ 15 (stating ITD invested $615,000 in upgrading a "frame" for Motorola to include Sun storage products and spent "thousands of dollars a year" purchasing Sun equipment that was loaned to AT&T).

## C.    The CDS Agreement

In 2009, Sun entered into an agreement with Verizon to provide services relating to a content delivery system ("CDS Agreement"), which was intended to function as an application

6

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

store similar to Apple's App Store.  Friedman Decl., Ex. 11 (Morrison Dep. Tr.) at 43:4-8.  The

CDS Agreement required that Sun "engage the services of Certified MWDVBE Suppliers for an

amount equivalent [to] at least eighteen percent (18%) of the dollars spent under th[e] Agreement".

Friedman Decl. Ex. 17 at Ex. E; Opposition at 21.  Verizon requested this provision in order to

ensure that it would be able to receive "diversity credits" in connection with the project.  Friedman

Decl, Ex. 70 at 122:7-16.  Verizon also believed that the use of a diversity supplier would enhance

its reputation with the federal government.  *Id.* at 48:20-22.  Prior to the contract's execution, Sun

and Verizon agreed that ITD would be the diversity supplier on the project.  *See* Wagner Decl., Ex.

L (Morrison Dep. Tr.) at 113:4-14.

The CDS Agreement was terminated in February 2011.  *See* Wagner Decl., Ex. L (Morrison

Dep. Tr.) at 146:23-147:3.

### D.     The Last Time Buy Agreement

In mid-2008, ITD purchased certain soon-to-be discontinued ("Last Time Buy") inventory

from Sun for the purpose of reselling it to Motorola.  Wagner Decl., Ex. E at ITDIST0002058;

Friedman Decl., Ex. 2 at No. 8.  ITD contends that, at the time of purchase, Sun agreed to "mitigate

ITD's risk" if ITD was unable to sell its Last Time Buy inventory to Motorola.  *Id.*.  Sun contests

this claim.  Motion at 21.

In any event, ITD was ultimately unable to sell all of the Last Time Buy inventory as

planned, and ITD approached Sun for assistance.   Wagner Decl., Ex. E at ITDIST0002058;

Friedman Decl., Ex. 2 at No. 8.  In an August 2009 email, Donald Bunker, Sun's Senior Sales

Executive, confirmed that, during a meeting between ITD and Sun regarding the Last Time Buy

Inventory, Sun agreed that it would modify its agreements with ITD to provide ITD with additional

discounts to be used "towards funding the [Last Time Buy] inventory that Motorola will not be

purchasing…."  Wagner Decl., Ex. E at ITDIST0002058.  Mr. Bunker further stated that it was

Sun's "intent[ion] to keep" the discounts in place "until the $6M USD of inventory [had] been

funded for ITD."  *Id.*  ITD contends these discounts were discontinued before Sun was able to

recoup its $6 million.  Friedman Decl., Ex. 2 at No. 8.

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

1

**United States District Court**
For the Northern District of California

### E.     Oracle Terminates ITD

In January 2010, Oracle acquired Sun.  Wagner Decl., Ex. M (Althoff Dep. Tr.) 19:16-17.

Shortly after acquiring Sun, Oracle undertook a plan to shift Sun's sales to its top customers from

an indirect model, in which sales were made through resellers like ITD, to a direct model, in which

product was sold directly by Oracle.  *Id.* at 19:13-23; *see also* Wagner Decl. Ex. T at

ORCL00252636-37 (stating that Oracle's goal was to transition Sun's top Global Accounts to a

"100% direct sales" and to make "[i]ndirect sales *highly* non-standard").  The customers Oracle

intended to transition to the direct sales model included ITD's two biggest customers, ALU and

Motorola.  *See* Wagner Decl., Ex. M (Althoff Dep. Tr.) at 49:3-11; Friedman Decl., Ex. 55 (stating

that, in 2009, Alcatel-Lucent accounted for 90% of ITD's accounts receivable).

On July 1, 2010, Oracle sent a "Notice of Termination" to ITD.  Spinella Decl., Ex. I ("July

Notice").  This notice purported to terminate all agreements, including the Sun Agreement,

between Oracle/Sun and ITD effective October 15, 2010. *Id.*  The notice did not set forth any

reasons for the termination.  *Id.*

On August 10, 2010, Oracle sent a follow-up letter retracting the July Notice.  Spinella

Decl., Ex. J.  The retraction letter stated that the July Notice "was sent in error."  *Id.*  Oracle has

adduced evidence that when the July Notice was sent, Oracle was in the process of terminating its

agreements with "thousands" of Sun Partners and that ITD was added to the list due to an

"administrative error."  *See* Friedman Decl., Ex. 10 (Lewis Dep. Tr.) at 91:6-92:6.  Oracle contends

these distributors were being terminated in advance of being moved over to Oracle's Partner

Network program.  *See* Friedman Decl., Ex. 1 at No. 1; *see also* Spinella Decl., Ex. I (July Notice)

(stating that ITD would "receive information about joining the Oracle Partner Network").

On September 30, 2010, just two months after the July Notice, ITD received a second

notice of termination.  Spinella Decl., Ex. K ("September Notice").  In this notice, Oracle stated

that the termination would be effective December 31, 2010.  *Id.*  Again, the notice did not provided

any reasons for the termination.  *Id.*

8

1    On December 29, 2010, after the close of business, and two days before the Sun Agreement

2    was set to terminate, Oracle sent ITD an agreement that purported to amend the Sun Agreement.

3    Wagner Decl., Ex. AF at ORCL00268556.  Under the amended agreement, ITD would be

4    restricted to selling to only three customers: Motorola, ALU, and HD Logix.  *Id.*  Furthermore, the

5    amended agreement would terminate after six months, on June 30, 2011.  *Id.*  Internal Oracle

6    documents suggest that the purpose of this agreement was to allow ITD to continue to act as a

7    distributor while Oracle completed its transition to direct sales.  *See* Wagner Decl., Ex. AC at

8    ORCL00498780 (("CGBU's approach is to transition all NEP business from [a mix of direct and

9    indirect sales] … to 100% direct to NEP sales… [d]uring our transition, approval is needed for

10   eight partners [including ITD] to enable business continuity… through… [the] transition to a direct

11   sales model.").  ITD signed the amended agreement on January 3, 2011.  *See* Wagner Decl., Ex.

12   AF at at ORCL00268558.

13   On April 15, 2011, approximately a month after this litigation began and 76 days before the

14   Amendment to the Sun Agreement was scheduled to terminate, Oracle sent ITD a third notice of

15   termination.  Friedman Decl., Ex. 57.  In the letter, Oracle stated that it was terminating ITD

16   because of its failure to pay invoices totaling $19,105,396.11.  *Id.*  Notably, the alleged non-

17   payment had begun in July 2010 (just after ITD received the July Notice).  *See* Friedman Decl., Ex.

18   3.  The April Notice provided ITD with 60 days to pay the invoices or the parties' agreement

19   would be terminated.  *Id.*  ITD failed to pay the invoices and the Sun Agreement was terminated.

20   **II.    PROCEDURAL BACKGROUND**

21   On March 2, 2011, ITD filed a complaint against Oracle in the Superior Court of New

22   Jersey.  ITD alleged eight causes of action including: (1) violation of the New Jersey Franchise

23   Protection Act ("NJFPA"); (2) breach of contract; (3) breach of the covenant of good faith and fair

24   dealing; (4) tortious interference with contract; (5) tortious interference with prospective economic

25   advantage; (6) promissory estoppel; (7) unjust enrichment; and (8) declaratory judgment.  *See* 11-

26   CV-02135-LHK, ECF No. 1-1.

27

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

On March 7, 2011, Oracle filed suit in the Northern District of California.  11-CV-01043-LHK, ECF No. 1.  In its action, Oracle sought to recover the approximately $19.1 million in unpaid invoices.  *Id.*  Oracle alleged causes of action for breach of contract, account stated, and goods sold and delivered.  *Id.*

On March 10, 2012, Oracle removed ITD's New Jersey action to the United States District Court for the District of New Jersey and then successfully moved to have the case transferred to the instant Court.  11-CV-02135-LHK, ECF Nos. 1 and 12.  After ITD's case was transferred, it was related to Oracle's action.  *See* 11-CV-01043-LHK, ECF No. 70.

On July 12, 2012, Oracle submitted its Motion for Summary Judgment.  Oracle seeks summary judgment as to ITD's: (1) first cause of action for a violation of the NJFPA; (2) second cause of action for breach of contract; (3) third cause of action for breach of the covenant of good faith and fair dealing; (4) fourth cause of action for intentional interference with contract; (5) fifth cause of action for tortious interference with prospective economic advantage; and (6) sixth cause of action for promissory estoppel.  Oracle also seeks summary judgment on its affirmative claims relating to the $19.1 million in outstanding invoices.

ITD filed its Opposition on July 26, 2012 ("Opposition).  Oracle filed its Reply on August 2, 2012 ("Reply").

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *See id.*  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id.* at 254.  The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not."  *Id.*

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1   "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor."  *See United Steelworkers*

2   *of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citing *Anderson*,

3   477 U.S. at 255).

4          The moving party bears the initial responsibility for informing the district court of the basis

5   for its motion and identifying those portions of the pleadings, depositions, interrogatory answers,

6   admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of

7   material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party opposing a properly

8   supported motion for summary judgment "may not rest upon the mere allegations or denials of

9   [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for

10  trial."  *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250.  The opposing party need not

11  show the issue will be resolved conclusively in its favor.  *See Anderson*, 477 U.S. at 248–49.  All

12  that is necessary is submission of sufficient evidence to create a material factual dispute, thereby

13  requiring a jury or judge to resolve the parties' differing versions at trial.  *See id.*

14         The moving party bears the initial burden of identifying those portions of the pleadings,

15  discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

16  *Corp.*, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial,

17  it must affirmatively demonstrate that no reasonable trier of fact could find other than for the

18  moving party, but on an issue for which the opposing party will have the burden of proof at trial,

19  the party moving for summary judgment need only point out "that there is an absence of evidence

20  to support the nonmoving party's case."  *Id.* at 325; *accord Soremekun v. Thrifty Payless, Inc.*, 509

21  F.3d 978, 984 (9th Cir. 2007).  Once the moving party meets its initial burden, the nonmoving

22  party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that

23  there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.

24  **IV.        DISCUSSION**

25         **A.        Choice of Law**

26         As an initial matter, the Sun Agreement includes a choice of law provision.  Specifically,

27  Section 9.1 states that "[a]ll disputes will be governed by the laws of California" and that "[c]hoice

28

11

of law rules of any jurisdiction will not apply to any dispute under the Agreement."   Friedman

Decl. Ex. 30, General Terms § 9.1.  Thus, prior to considering the parties' claims, the Court must

determine whether this provision should apply.

    In determining whether to respect a contractual choice of law provision, federal district

courts sitting in diversity are generally bound by the choice of law provisions of the state in which

they reside.  *See Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (applying

California's choice of law rule despite choice of law provision in contract).  However, when a case

is transferred pursuant to 28 U.S.C. § 1404, as this case was, "the transferee district court [is]…

obligated to apply the state law that would have been applied if there had been no change of

venue."  *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964), *superseded by statute on other grounds*.

Because the instant case is actually a consolidation of two related cases, which were filed in

different states, the law governing each party's affirmative claims may differ.

    ITD originally brought its claims in the District of New Jersey.  Thus, this Court must apply

New Jersey choice-of-law rules in determining whether the parties' selection of California law

should be honored.  *See Ferens v. John Deere Co.*, 494 U.S. 516, 524-25 (1990) (holding that,

pursuant to *Van Dusen*, Mississippi choice of law rules applied following the transfer of the case to

Pennsylvania under Section 1404).  Broadly speaking, New Jersey choice-of-law rules provide that

"courts will uphold the contractual choice [of law] if it does not violate New Jersey's public

policy."  *Instruction Sys., Inc. v. Computer Curriculum Corp.* ("*ISI*"), 614 A.2d 124, 133 (N.J.

1992) (citation omitted).

    ITD's first cause of action alleges a violation of the New Jersey Franchise Protection Act

("NJFPA").  Applying New Jersey's choice-of-law rules, courts have found that contractual

choice-of-law agreements that prevent application of the NJFPA by selecting the substantive law

from another state are contrary to New Jersey public policy.  *See, ISI*, 614 A.2d at 133-35 (holding

that New Jersey law applied to plaintiff's NJFPA claim despite the presence of a choice-of-law

provision selecting California law in the contract).  Accordingly, the Court will apply New Jersey

law for the purposes of resolving this claim.  *Id.*  With respect to ITD's other claims, courts

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   applying New Jersey's choice-of-law rules have concluded that the parties' choice of law should be

2   respected with regards to common law claims.  *See Goldwell of N.J., Inc.v. KPSS, Inc.*, 622 F.

3   Supp. 2d 168, 193 (D.N.J. 2009) (holding that, where the contract included a choice of law

4   provision selecting Maryland law, New Jersey law was applicable to the NJFPA claim but

5   Maryland law was applicable to the non-NJFPA claims).  Accordingly, ITD's remaining causes of

6   action will be decided under California law.

7         Oracle's claims were originally brought in this district.  *See* Compl., EFC No. 1.  Thus,

8   even in the absence of the parties' choice of law provision, Oracle's claims would be governed by

9   California law.  Accordingly, the Court need not determine whether California choice-of-law rules

10  would uphold the parties' choice of California law.

11         **B.      ITD's New Jersey Franchise Practices Act Claim**

12         Oracle moves for summary judgment on ITD's first cause of action for a violation of the

13  New Jersey Franchise Practices Act ("NJFPA").  The NJFPA prohibits a franchisor from

14  "terimiat[ing], cancel[ing,] or fail[ing] to renew a franchise without good cause."  N.J. Stat. Ann.

15  §56:10-5 (West).  Under the statute, a "franchise" is defined as "a written arrangement . . . in which

16  [1] a person grants to another person a license to use a trade name, trade mark, service mark, or

17  related characteristics, and [2] in which there is a community of interest in the marketing of goods

18  or services…."  *Id*. §56:10-3 (West).  The NJFPA additionally requires that the franchise "establish

19  or maintain a place of business within the State of New Jersey."  *Id*. §56:10-4.  Accordingly, in

20  order to qualify as a franchise under the NJFPA, ITD must show that: (1) the franchisor granted the

21  franchisee a "license"; (2) there is a "community of interest" between the franchisor and

22  franchisee; and (3) the parties contemplated that the franchisee would maintain a "place of

23  business" in New Jersey.  *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 268-69

24  (3d Cir. 1995) (citing N.J. Stat. Ann.  §§ 56:10-3a, -4).

25         Oracle contends that summary judgment is appropriate as to ITD's NJFPA claim for several

26  reasons.  First, Oracle argues that ITD is not a franchise because it did not have a license.  Motion

27  at 11-13.  Second, Oracle argues that there was no community of interests between Sun/Oracle and

28

                                                13

ITD.  *Id.* at 13-17.  Third, Oracle argues that ITD did not maintain a place of business as required by the statute.  *Id*. at 17-18.  Finally, Oracle argues that, regardless of whether ITD is a franchise, Oracle did not violate the NJFPA because it did not terminate ITD without good cause.  *Id.* at 18-19.  The Court considers each of these issues in turn.

### 1.   License in Oracle's Trademark

#### a)   The Parties' Contentions Regarding the Licensing Issue

Oracle argues that ITD's claims under the NJFPA must fail as a matter of law because ITD does not have a "license" to use Oracle's trade name and is therefore not a "franchise" within the meaning of the statute.  Motion at 10-11.  Oracle contends that ITD cannot have been granted a license because the contract between the parties explicitly disclaims the existence of a license. Motion at 11; Friedman Decl. Ex. 30, iForce Terms § 12.1 ("[ITD] is granted no right, title or license to, or interest in, any Sun Trademark.").  Moreover, under the contract, ITD was permitted only "*limited, non-exclusive*" use of Sun's logo, and when using the logo, ITD was required to comply with strict guidelines.  Motion at 6 (citing Friedman Decl. Ex. 30, iForce Terms § 12.2) (emphasis added).  For example, ITD could only use the logo "to refer… to Sun's program for [ITD's] Partner Type…."  *Id.*  Additionally, when using the logo in "advertising and marketing materials," ITD also had to "prominently display [its] own corporate name and logo…."  *Id.* § 12.2(b).  Oracle contends these textual provisions show that no license was conferred in this case.[3]

ITD responds that Oracle's reliance on the contract is misplaced.  ITD contends that, in determining whether a license exists, New Jersey courts look beyond the parties' written

---

[3] In its Reply, Oracle also argues that ITD's franchise claim is barred because the Sun Agreement, "[o]n [i]ts [f]ace," disclaims the existence of a franchise.  Reply at 2; *See* General Terms § 9.4 ("Neither the General Terms nor any Agreement is intended to create a… franchise….").  To the extent that Oracle is arguing that its disclaimer of a franchise in the franchise agreement is *completely* dispositive of the issue, notwithstanding any other evidence regarding the parties' relationship, this argument is rejected.  Oracle fails to support this argument with any law. Moreover, Courts have held that: "The question of whether the business relationship between the parties constituted a franchise… [requires] an examination of both the language of the [contract]… and of the parties' practices and course of conduct."  *Southern States Co-op., Inc. v. Global AG Associates, Inc.*, No. 06-1494, 2008 WL 834389, at *4 (E.D. Penn. 2008) (citing *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131, 1137 (3d Cir. 1991)).

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION FOR SUMMARY JUDGMENT

1 | agreement.  *See* Opposition at 14 (citing *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*,

2 | 179 F.R.D. 450, 471 n.9 (D.N.J. 1998)).  Citing *ISI* and *Cooper*, ITD argues that, in determining

3 | whether a license exists, the court should focus on whether there was a "perception among

4 | customers" that the parties were "integrally related."  Opposition at 13 (citing *ISI*, 614 A.2d 124;

5 | *Cooper*, 63 F.3d 262).  ITD contends that there was such a perception among its customers.  *Id.* at

6 | 13-14.  Accordingly, ITD argues that there is evidence sufficient to create a dispute of material

7 | facts as to whether it had a license for the purposes of the NJFPA.  *Id.*

8 | Having reviewed the parties' submissions, the Court concludes that ITD has presented

9 | sufficient evidence of a license to survive summary judgment.

10 | **b)      The Law Governing the Licensing Issue**

11 | The "hallmark" of a franchise license is that the franchisor gives its "imprimatur" (its

12 | approval) "to [the franchisee's] business enterprise in respect to the [franchisor's] product" and that

13 | its trade name induces "the consuming public to expect from [the franchisee] a uniformly

14 | acceptable and quality controlled service endorsed by" the franchisor.  *Neptune T.V. & Appliance*

15 | *Serv., Inc. v. Litton Sys., Inc. ("Neptune")*, 462 A.2d 595, 599 (App. Div. 1983).  The mere right to

16 | use a franchisor's name or mark in marketing the franchisor's products is not sufficient to confer a

17 | license.  *ISI*, 614 A.2d at 138.  Rather, the franchisee "must use the name of the franchisor 'in such

18 | a manner as to create a reasonable belief on the part of the consuming public that there is a

19 | connection between the... licensor and licensee by which the licensor vouches, as it were, for the

20 | activity of the licensee.'"  *Id.* at 139 (quoting *Neptune*, 462 A.2d at 599).  In determining whether a

21 | license is present, the Court must consider not only the parties' written agreement, but also their

22 | "relationship."  *ISI*, 614 A.2d at 139; *see also Cooper*, 63 F.3d at 272 (holding that a reasonable

23 | jury could have "inferred the existence of a 'license' based on various aspects of the lengthy

24 | Amana-Cooper relationship").

25 | Two cases, *ISI* and *Cooper*, are instructive with respect to the factors that are relevant in

26 | determining whether a license has been granted.  In *ISI*, the plaintiff, Instructional Systems Inc.

27 | ("ISI") was the exclusive distributor of defendant Computer Curriculum Corporation's ("CCC")

28 |

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1  computerized educational-learning systems for the northeast.  *ISI*, 614 A.2d at 126.  ISI alleged that

2  it was a franchise under the NJFPA, and that it had been improperly terminated by CCC.  *Id.* at

3  127.  In addressing the licensing issue, the Court noted that ISI had "always operated under its own

4  trade name, and… [did] not use CCC's name on its stationery, business cards, or on any business

5  signs"; however the Court held that the "relationship" between the parties indicated the presence of

6  a license.  *Id.* at 139.  The factors the Court considered in reaching this conclusion included, among

7  other things, that: (1) ISI was "*required*… to 'use *its best efforts* to maintain and *promote* CCC's

8  name, trademark and logo on the Products," *id.* (emphasis in original); (2) ISI was *prohibited* from

9  selling any of CCC's competitor's products, *id.*; (3) CCC's product was "not an 'off-the-shelf'

10  product… [but instead] it [was] a unique combination of hardware and software whose identity

11  [was] integrally related with that of ISI," *id.*; and (4) ISI was CCC's exclusive distributor and

12  "CCC explicitly promoted ISI" as such. *Id.* at 140.  The Court held that these factors were enough

13  to "induce[] the consuming public to expect from ISI a uniformly acceptable and quality controlled

14  service endorsed by CCC itself." *Id.* (internal punctuation omitted).

15       Similarly, in *Cooper*, the Court held that plaintiff Cooper Distributing Co., Inc., a

16  distributor of and authorized service provider for defendant Amana Refrigeration, Inc.'s home

17  appliances, had a license in Amana's trade name for the purposes of the NJFPA.  *Id.*, 63 F.3d at

18  273.  In reaching this conclusion, the Court noted that: (1) Cooper was "the exclusive Amana

19  distributor and servicer of Amana products"; (2) Cooper's showroom displayed the Amana sign;

20  (3) Cooper's servicemen wore Amana uniforms; (4) Cooper's servicemen were "integrally related"

21  to the proper function of Amana products because the agreement between the parties "required

22  Cooper to give 'warranty' service" on Amana's products; and (5) "Cooper's customer service was

23  important so that customers would distinguish Amana from other manufacturers…." *Id.* at 272-73.

24  The Court also emphasized the fact that Cooper's dealers had testified that they "regarded Amana

25  and Cooper as being 'one and the same.'" *Id.* at 273.

26

27

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

c)      **Application to the Instant Case**

To be sure, this case is different than *ISI* and *Cooper* in several respects.  For example, ITD was not Sun's exclusive distributor for any region or market.  *See ISI*, 614 A.2d at 139; *Cooper*, 63 F.3d at 273 (finding it "noteworthy that Cooper was the exclusive Amana distributor to local dealers in Cooper's four-state territory").  ITD was also not prohibited from selling Sun's competitor's products, nor was it "*required*… to… promote [Sun's] name…."  *ISI*, 614 A.2d at 139.  Furthermore, ITD's sales staff did not wear Sun uniforms.  *Cooper*, 63 F.3d at 272.

Moreover, it is arguable whether ITD's use of Sun's logo at marketing events and on promotional items, including "banners, t-shirts, and brochures," shows that ITD was a franchise licensee.  Opposition at 14.  Consistent with the terms of the Sun Agreement, each of the promotional items bearing Sun's logo also bore an equally prominent ITD logo.  *See* Spinella Decl., Ex. F.  Some courts have held that such use of a franchisor's logo is indicative of a franchise licens*e*.  *See Lithuanian Commerce Corp.*, 179 F.R.D. at 471 (holding that LCC's use of "numerous promotional devices" including, *inter alia*, "a van prominently displaying the LCC name alongside a L'egg's [the franchisor's product] poster" was sufficient to enable a reasonable jury to find that there was a license).  Others have suggested that it is not.  *See Liberty Sales Assocs., Inc. v. Dow Corning Corp.*, 816 F. Supp. 1004, 1010 (1993) (holding that Dow's authorizing "Liberty to provide… promotional gifts" with "both Dow and Liberty's names printed on them" did not turn Liberty into a licensee for the purposes of the NJFPA).  This Court need not reach this issue.

This Court concludes that ITD has presented sufficient evidence to create a material factual dispute as to whether ITD had a franchise license.  Significantly, ITD has presented evidence that at least one of its two primary customers, Alcatel-Lucent,[4] "believed that Sun vouched for the activities of ITD."  Wagner Decl., Ex. D., (Young Dep. Tr.) at 122:18-22.  According to August Manz, ALU's former Global Supplier Relationship Manager, he considered ITD to be "essentially

---

[4] Defendants concede that the "vast majority of ITD's business" was from Alcatel-Lucent and Motorola.  Motion at 13.  Indeed, in 2009, Alcatel-Lucent accounted for 90% of ITD's accounts receivable.  *See* Friedman Decl., Ex. 55.

17

**United States District Court**
For the Northern District of California

1    an extension of Sun."  Declaration of August F. Manz, Jr. ("Manz Decl."), ECF No. 161, ¶ 4.

2    Indeed, Sun appears to have shared this view.  Wagner Decl., Ex. D (Young Dep. Tr.) at 120:18-20

3    (stating that "resellers were an extension of Sun as a company[,] of their products[,] and their

4    services").  As recognized in *Cooper*, the perception among customers that the franchisor and

5    franchisee share a "special relationship" or that they are "one and the same" is a critical factor in

6    determining the existence of a franchise license.  *See Cooper*, 63 F.3d at 273.  In this case, there

7    were several factors that may have contributed to the perception that Sun vouched for ITD.

8        First, ITD has presented evidence suggesting that its marketing services were "integral[]" to

9    Sun's marketing scheme.  *Cooper*, 63 F.3d at 272.   In order to reduce its own overhead, Sun relied

10   heavily on resellers like ITD to market its products.  *See* Wagner Decl., Ex. D. (Young Dep. Tr.) at

11   119:10-17.  Indeed, approximately 50 to 60 percent of Sun's sales were accomplished through

12   resellers like ITD.  *See also id.* at 120:20-24.  Thus, resellers like ITD were Sun's representatives

13   in the market.  This could have led ITD's customers, particularly ALU and Motorola, to perceive

14   "that [Sun] vouched for [ITD's] use of [Sun's] name."  *Cooper*, 63 F.3d at 272.

15       Second, ITD's value added services appear to have been designed "to [promote] the proper

16   functioning of [Sun's] products."  *Cooper*, 63 F.3d at 272 (holding Cooper's repair services were

17   integrally related to the functioning of Amana's products).  For example, ITD provided services

18   including, *inter alia*, customization of Sun's products, integration services, and facilitation of

19   infrastructure deployments.  Spinella Decl., ¶ 2.  These services facilitated the deployment of Sun's

20   products and ensured that Sun's products met customer needs.  Indeed, as in *Cooper*, ITD's

21   services appear to have been "a huge competitive differentiator" for Sun.  Wagner Decl., Ex. D

22   (Young Dep. Tr.) at 125:1-6, 21-22; *Cooper*, 63 F.3d at 273 (noting the fact that Cooper's services

23   were "important so that customers would distinguish [Sun] from other manufacturers.").  Thus, the

24   role ITD's value added services played in ensuring the proper functioning of Sun's products may

25   have also fostered the perception that Sun vouched for ITD's work.  *Cooper*, 63 F.3d at 272.

26       Third, Sun directly warrantied all products purchased through ITD.  Wagner Decl., Ex. D.,

27   (Young Dep. Tr.) at 120:25-121:3.  Indeed, the presence of a "direct[]" warranty from Sun was a

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

1   critical factor in many customer's decisions to purchase Sun's products from ITD.  *Id.* at 121:19--

2   25.  As recognized by Mr. Young, one of Sun's former executives, this warranty "further cause[d]

3   customers to believe that ITD was an extension of Sun."  *Id.* at 121:13-18.

4        Fourth, Sun, rather than ITD, negotiated the pricing for sales of Sun's products.  Manz

5   Decl., ¶ 5.  Sun's role in negotiating pricing could lead a reasonable consumer to conclude that,

6   when it purchased product from ITD, Sun was vouching for that product.

7        Fifth, ITD displayed Sun's banner and logo in its corporate offices.  *See* Spinella Decl., ¶

8   25.  This factor was found to be indicative of a license in *Cooper*.  *See id.*, 63 F.3d at 272 (inferring

9   the existence of a license in part because "Cooper's showroom displayed the Amana sign").

10        In light of these facts, the Court is unable to conclude, as a matter of law, that ITD did not

11   have a franchise license for the purposes of the NJFPA.

12        Oracle's reliance on *Pride Tech. Inc. v. Sun Microsystems Computer Corp.* for the

13   proposition that no license exists in the present case is misplaced.  *Id.*, No. C-94-7001, CCH Bus.

14   Franch. Guide, ¶ 10,407 (Mar. 3, 1994).  In *Pride*, the Court concluded that Pride, a New Jersey

15   corporation in the business of selling computers, software, and computer consulting services, was

16   not a Sun franchise under the NJFPA.  *Id.* at 3-4.  While *Pride* did involve a nearly identical

17   contract provision governing Pride's use of Sun's trade name, it is distinguishable in at least two

18   material respects.  *Id.* at 2.  First, the *Pride* Court emphasized that Pride sold "different types of

19   computers manufactured… by various companies."  *Id.* at 1, 3.  As will be discussed *infra* in

20   Section III(B)(2) almost all ITD's revenues came from its sale of Sun's products.  *See* Spinella

21   Decl. ¶ 6.  Second, Pride was decided on a motion for preliminary injunction and, unlike the

22   present case, there was no factual record indicating that "consumers felt that the franchise and

23   franchisor were… one and the same…."  *Pride* at 3; *see also* Manz Decl., ¶ 4.

24        The remaining cases cited by Oracle are similarly inapposite.  Motion at 11 (citing *Colt*

25   *Indus. Inc., v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 119 (3rd Cir. 1988); *Southern*

26   *States Co-op., Inc. v. Global AG Associates, Inc.*, No. 06-1494, 2008 WL 834389, *7 (E.D. Penn.

27   2008); *Liberty Sales Associates, Inc.*, 816 F. Supp. at 1010-11.  Significantly, in these cases, there

28

19

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

1    was no deposition testimony, customer affidavits, or other evidence showing that consumers

2    believed the franchisor vouched for the franchisee (*see* Wagner Decl., Ex. D (Young Dep. Tr.) at

3    122:18-22), or that the franchisee was an extension of the franchisor.  *See* Manz Decl., ¶ 4.

4         For the reasons stated above, the Court denies Oracle's motion for summary judgment with

5    respect to the licensing issue.  The Court notes, however, that in reaching this conclusion, it does

6    not express a view on the relative merits of the parties' positions.

7                        **2.      Community of Interest**

8         Oracle also contends that summary judgment is appropriate because there is no "community

9    of interest" between ITD and Oracle.  Motion at 13.  As set forth in *ISI*, a community of interest

10   exists "when the terms of the agreement between the parties or the nature of the franchise business

11   requires the licensee, in the interest of the licensed business's success, to make a substantial

12   investment in goods or skill that will be of minimal utility outside the franchise."  *Id.* at 142

13   (quoting *Cassidy*, 944 F.2d at 1143).  "Thus, in order to find a 'community of interests,' two

14   requirements must be met: (1) the distributor's investments must have been 'substantially

15   franchise-specific', and (2) the distributor must have been required to make these investments by

16   the parties' agreement or the nature of the business."  *Cooper*, 63 F.3d at 269.

17        Oracle contends that ITD cannot establish there was a community of interest between Sun

18   and ITD because ITD cannot show it made any significant franchise-specific investments.  Motion

19   at 15.  Oracle's argument fails.  ITD has adduced sufficient evidence of substantial franchise

20   specific investments.

21         For example, ITD has adduced evidence showing that it was contractually obligated to

22   make substantial investments in developing Sun-specific knowledge and skills, including "[s]erver

23   training, software training, partner training, [and] services training…."  Wagner Decl., Ex. D

24   (Young Dep. Tr.) at 114:15-18; Spinella Decl., Ex. D at ORCL00903417 ("Partners must be

25   knowledgeable in sizing, configuring, integrating, and delivering services on Sun Products…."); *Id.*

26   at ORCL00903417-21 (discussing training courses and accreditation process).  ITD was also

27   required to hire specialized staff, including a "technical architect" with responsibility for designing,

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

"deploy[ing,] and integrat[ing] Sun Products…."   Spinella Decl., Ex. D at ORCL00903404; Spinella Decl., ¶ 21 (stating that ITD was required to employ individuals with ISO and TSO certifications, individuals who were trained in product assembly, and individuals trained to place orders on Sun configurations).

As recognized by Mr. Young, a former Sun/Oracle executive, ITD's investments in acquiring Sun specific knowledge were "significant."  Wagner Decl., Ex. D (Young Dep. Tr.) at 114:1-4; Spinella Decl., ¶ 21 (noting that ITD spent approximately $330,000 on Sun related trainings and certifications).  Moreover, the knowledge ITD acquired was not transferable to Sun's competitor's products.  Wagner Decl., Ex. D (Young Dep. Tr.) at 114:1-19-115:12.  ITD's investment in acquiring knowledge about Sun's products, therefore, constitutes substantial franchise-specific investments.  *See Cooper*, 63 F.3d at 270 (holding that Cooper's significant investments in "the acquisition of knowledge about Amana products" supported the conclusion that there was a community of interest between Cooper and Amana)

ITD has also adduced evidence that it was required to make other non-transferable investments in order to facilitate its business with Sun.  For example, ITD invested $1 million in a Sun/Oracle specific inventory database and a Sun/Oracle specific warehouse management platform.  Spinella Decl. ¶ 14.[5]  ITD also invested significant sums in "loaner" equipment as a means of generating interest in Sun's products.  Spinella Decl., ¶ 15 (stating ITD invested $615,000 in upgrading a "frame" for Motorola to include Sun storage products and spent "thousands of dollars a year" purchasing Sun equipment that was loaned to AT&T).  These investments further support the conclusion that ITD made substantial franchise-specific investments.

---

[5] ITD also contends that its investment in the 18,000 square foot integration facility was non-transferable.  Opposition at 17 (*citing* Spinella Decl. ¶ 16).  This assertion is dubious in light of Mr. Browne's testimony that ITD was able to repurpose this facility to use HP products at no additional cost.  Friedman Decl., Ex. 6 (Browne Dep. Tr.) at 65:24-66:9; Ex. 37 (ITD 2011 Business Plan for HP) (stating that ITD's "software development, hosting, integration and professional services… could be readily transitioned to focus on HP and IBM.").

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1     The existence of a community of interest is also supported by the fact that ITD

2 received the vast majority of its sale of Sun products.  *See Cooper*, 63 F.3d at 272 (stating

3 that economic dependence is "the 'most important' factor in determining whether a

4 community of interest exists").  For example in 2005, ITD received 100% of its revenue

5 from its sale of Sun products.  Similarly, in 2006, 2007, 2008, 2009, and 2010, ITD's

6 revenues from its sale of Sun products accounted for 99.86%, 61.83%, 77.22%, 95.15%,

7 and 96.09% of total revenues, respectively.  *See* Spinella Decl. ¶ 6.  The high percentage of

8 ITD's revenues attributable to the sale of Sun products further supports the conclusion that

9 there was a community of interest between ITD and Oracle.  *See Cooper*, 63 F.3d at 272

10 (concluding that there was a community of interests between plaintiff and defendant where

11 85% of plaintiff's revenues were derived from defendant's products).[6]

12     In light of ITD's evidence of substantial franchise-specific investments, the Court

13 cannot conclude, as a matter of law, that there was no community of interest between ITD

14 and Oracle.  Accordingly, Oracle's motion for summary judgment on this ground is denied.

15                     **3.     Place of Business in New Jersey**

16     Oracle also contends that ITD was not a franchise because it did not maintain a place of

17 business in New Jersey.  Motion at 19.  Oracle argues that ITD's Edison, New Jersey facility does

18 not constitute a "place of business" under the aforementioned statute because "the vast majority of

19 ITD's products are sold remotely . . . and delivered at the customers' facilities."  Motion at 17.

20 This argument fails.

21     Under the NJFPA, " 'Place of business' means a fixed geographical location at which the

22 franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the

23

---

24 [6] In the Motion, Oracle also argues that ITD cannot show the existence of a community of interests
because it cannot show that: (1) Oracle exercised "control" over ITD, and (2) a "disparity in
25 bargaining power" between ITD and Oracle.  Motion at 13.  These factors, along with the
"presence of a franchise-specific investment" and "economic dependence," were identified in
26 *Cassidy* as factors that are relevant in determining whether there was a community of interests.  *Id.*,
944 F.2d at 1140.  In light of the evidence of ITD's substantial franchise specific investments and
27 ITD's dependence on Sun's products for its revenues, the Court concludes that there is sufficient
evidence of a community of interests.  Accordingly, the Court need not consider the additional two
28 factors raised by Oracle.

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1   franchisor's services." N.J. Stat. Ann. § 56:10-3 (West).  Ordinarily, the place of business

2   requirement demands something more than "an office [or] a warehouse."  *Id.*  However, courts

3   have recognized that, under certain circumstances, a commercial office may qualify as a place of

4   business under the Act.

5         For example, in *ISI*, the Court held that the place of business requirement was satisfied by

6   ISI's Hackensack, New Jersey office, which was located on the sixth floor of a commercial office

7   building.  *ISI*, 614 A.2d at 138.  In reaching this conclusion, the Court relied upon the fact that the

8   office featured a mock laboratory where customers were permitted to test CCC's products.  *Id.*  The

9   Court also noted that ISI hosted numerous demonstrations at this laboratory every year.  *Id.*  The

10  office was therefore "more than a mere sales office or warehouse."  *Id.*  It was a "marketing

11  facility… where [ISI's] customers… [could] receive… [a] sales demonstration of the operation of

12  [CCC's] complex [computer] product."  *Id.*

13        Similarly, ITD has adduced evidence that, rather than being just a sales office or

14  warehouse, its Edison, New Jersey office is a marketing facility.  ITD held "hundreds of on-site

15  sales meetings" at its office.  *Id.* ¶ 26; Friedman Decl., Ex. 33 at ITDIST0176756 (stating that the

16  Edison New Jersey office includes "warehouse, integration center[, and]… sales").  Moreover,

17  similar to ISI's office, ITD's office included a demonstration facility for Sun's products.  *Id.* ¶ 25.

18  This facility included server racks that were organized so customers could "see how the cables

19  were laid-out," as well as "signs describing the Sun/Oracle machines…."  *Id.*  ITD and Sun hosted

20  a number of events in which customers toured its facility.  *Id.* ¶26-28; *see also id.* ¶ 26 (stating that

21  ITD and Sun met with Verizon representatives at ITD's offices numerous times and that these

22  representatives toured the demonstration facility).  In light of these facts, the Court concludes that

23  ITD has adduced sufficient evidence that its office qualifies as a place of business under the Act.

24  *See ISI*, 614 A.2d at 138.

25        As ITD points out in its Opposition, its office also qualifies as a place of business under the

26  recently added exception for businesses that do not make the "majority of [their] sales directly to

27  consumers."  N.J. Stat. Ann. § 56:10-3.  This exception was added in 2010.  *Id.*  Under this

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

exception, notwithstanding the fact that the franchisee does not "display[]… [or] sell[] the franchisor's goods" from its office, its office may still qualify as a place of business if: (1) it is the place where the franchisee's "personnel… call upon customers," or (2) the franchisee's "goods are delivered to customers" from the location.  *Id.*

The threshold issue that must be addressed in determining whether ITD qualifies under this exception is whether ITD makes the "majority of [its] sales directly to consumers."  N.J. Stat. Ann. § 56:10-3.  Notably, the statute does not define the term "consumer," and the Court is unaware of any prior precedent construing the term.  Black's Law Dictionary defines consumer as: "[a] person who buys goods or services for personal, family or household use, with no intention for resale."  Black's Law Dictionary (9th ed. 2009).

Here, ITD sells primarily to Network Equipment Providers ("NEPs"), as opposed to "end-user[s]."  Friedman Supp. Decl., Ex. 72 (Spinella Dep. Tr.) at 33:3.  Unlike end-users, NEPs do not buy equipment for "their own internal consumption," but rather so that they can package it with their own products and resell the goods to end-users.  *Id.* at 31:15-22.  In light of the fact that NEPs are not purchasing product primarily for their personal use, they are not consumers.  Accordingly, ITD does not make the majority of its sales to consumers.  ITD is therefore eligible for the exception if either of the two other requirements are met (*i.e.* the location is the place where the franchisee's employees call upon customers or goods are delivered from the location).

ITD has adduced evidence showing it meets the other requirements for the exception.  In his declaration, Mr. Spinella states that ITD's Edison office is the place where its sales people "call[] upon customers," and this office is the location "where Sun/Oracle goods were stored and delivered to customers."  Spinella, Decl., ¶ 29.  Accordingly, the Court concludes ITD's office qualifies as a place of business under the exception.

Oracle's reliance on *Liberty Sales Associates* and *Fischer Thompson Beverages, Inc. v. Energy Brands Inc.*, CIV.A.07-4585 (SRC), 2007 WL 3349746 (D.N.J. Nov. 9, 2007), in support of its contention that ITD's facility does not qualify as a place of business is misplaced.  In *Liberty*, the Court held that plaintiff company's president's home did not qualify as a place of business

under the statute because it "was used primarily as an office for telephone sales calls, paper work and an occasional meeting or demonstration, and as a short-term warehouse."  Similarly, in *Fischer*, the Court held that plaintiff's 40,000 square-foot facility did not qualify as a place of business because there was no evidence that "any substantial sales, product promotion or related interaction with purchasers" took place there.  *Fischer*, 2007 WL 3349746, at *3.  Here, ITD has adduced evidence that its Edison office was the hub for substantive sales and marketing activity including numerous customer demonstrations and meetings.  Moreover, both these cases were decided before the statute was amended in 2010 to include an exception to the office and warehouse prohibition.  Accordingly, *Liberty* and *Fischer* are inapposite.

For these reasons, the Court denies Oracle's motion for summary judgment with respect to the issue of whether ITD maintains a place of business in New Jersey as required by the  NJFPA.

### 4.    Good Cause for Termination

Oracle next argues that even if the NJFPA applies to the Sun Agreement, ITD's claims fail because Oracle had good cause to terminate the agreement.  Motion at 18.

The NJFPA states: "It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause."  N.J. Stat. Ann. § 56:10-5 (West).  For the purposes of the statute, "good cause" is limited to situations where a franchisee has failed to "substantially comply" with the parties' agreement.  *Id.*  " '[S]ubstantial compliance' is simply the absence of 'material breach' of contract."  *Goldwell*, 622 F. Supp. 2d at 188.  A franchisor seeking to terminate a franchise relationship must give "written notice setting forth all the reasons for such termination… at least 60 days in advance of such termination."  N.J. Stat. Ann. § 56:10-5 (West).  As recognized in *Goldwell*, a franchisor violates the Act when it sends, without good cause, a letter providing "unequivocal notice" of its intent not to renew the parties' agreement.  *See Id.*, 622 F. Supp. 2d at 189-93 (holding that "an unequivocal notice of intent not to renew is no difference from the actual failure to renew that is bound to follow" and denying summary judgment because there was a material issue of fact as to whether defendant had good cause to terminate the franchise agreement when it sent its notice of intent not to renew).

United States District Court
For the Northern District of California

1    Here, Oracle contends that its April 15, 2010 letter constituted its notice of termination for

2  the purposes of the Act.  Motion at 18-19 (citing Friedman Decl., Ex. 57).  Oracle contends that it

3  did not violate the Act by sending this letter because ITD's failure to pay approximately $19.1

4  million in unpaid invoices gave it good cause to terminate the parties' agreement.  Motion at 18.

5  Moreover, Oracle argues that, consistent with the statutory requirements, the letter identified the

6  basis for Oracle's decision to terminate ITD and provided ITD sixty days to cure its breach.  *Id.* at

7  18-19.  Accordingly, Oracle contends that it did not violate the Act when it terminated ITD.

8    Oracle's description of the sequence of events leading to its termination of ITD is

9  somewhat incomplete.  As ITD points out in the Opposition, prior to sending the April Notice,

10  Oracle sent two other letters to ITD, on July 1, 2010, and September 30, 2010, respectively,

11  purporting to terminate the Sun Agreement.  Spinella Decl., Ex. I; Ex. K.  Notably, neither letter

12  provided any grounds for termination.  Moreover, the evidence suggests that, when these letters

13  were sent, Oracle was in the process of terminating all its resellers in an effort to move to a direct

14  sales model.  *See* Wagner Decl., Ex. M (Althoff Dep. Tr.) at 19:13-23 (discussing Oracle's plan to

15  transition to a direct sales model); Ex. T at ORCL00252636-37 (stating that Oracle intended to

16  transition to a "100% direct sales" model for Global Accounts and to make "[i]ndirect sales

17  *highly* non-standard").  Thus, making it doubtful that Oracle's termination letters in July and

18  September were based on good cause.  Accordingly, to the extent these letters constitute

19  "unequivocal" notices of Oracle's intent to terminate the Sun Agreement, Oracle violated the Act

20  by sending them.  *Goldwell*, 622 F. Supp. 2d at 190.

21    Oracle argues that neither letter constituted a true notice of termination under the Act.

22  Reply at 11.  Oracle argues that the July letter was not a notice of termination because it was

23  retracted shortly after it was sent.  Reply at 11; *see also* Friedman Decl., Ex. 10 (Lewis Dep. Tr.) at

24  91:6-92:6.  Oracle argues that the September letter was not a notice of termination because the Sun

25  Agreement was not *actually* terminated on December 31, 2010 (the termination date set forth in the

26  letter) but was rather amended and renewed.  Reply at 11; Wagner Decl., Ex. AF at

27  ORCL00268556.  These arguments fail.

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1        While the July letter was rescinded, if ITD was aware of Oracle's plan to terminate its

2   channel partners and sell directly, the letter may have provided ITD with unequivocal notice of

3   what was on the horizon, notwithstanding the letter's retraction.  *See* Wagner Decl., Ex. M at

4   19:13-23 (stating that Oracle's plan to take Sun's customers direct was "communicated publicly to

5   the market").  Similarly, the Court cannot conclude that the September letter was not a notice of

6   termination.  The January 2011 amendment that Sun argues superseded the September letter only

7   extended the agreement for another six months and limited ITD to three customers.  Wagner Decl.,

8   Ex. AF at ORCL00268556.  Indeed, Oracle's internal documents suggest that the amendment was

9   only intended to allow ITD to sell Sun products temporarily while Oracle completed its transition

10  to direct sales.  Wagner Decl., Ex. AC at ORCL00498780 (recommending that ITD be permitted to

11  continue selling to ALU and Motorola "[d]uring [Oracle's] transition" to 100% direct sales).

12  Accordingly, the Court cannot conclude as a matter of law that the July or September letters did not

13  terminate the Sun Agreement.

14       As set forth above, there are disputed issues of material fact concerning: (1) when Oracle

15  gave notice of its intent to terminate the Sun Agreement, and (2) whether Oracle had good cause to

16  terminate the agreement when notice was given.  Thus, the Court cannot conclude, as a matter of

17  law, that Oracle did not violate the NJFPA when it terminated ITD.

18       In light of the Court's conclusions that there are disputed issues of material fact concerning:

19  (1) whether ITD had a franchise license in Sun's trade name; (2) whether ITD and Sun shared a

20  community of interests; (3) whether ITD maintained a place of business (as that term is defined in

21  the NJFPA) in New Jersey; and (4) whether Oracle violated the NJFPA when it terminated ITD,

22  Oracle's motion for summary judgment is denied as to ITD's NJFPA claim.

23                      **A.   ITD's Breach of Contract Claims**

24       Oracle also seeks summary judgment on ITD's second cause of action for breach of

25  contract.  Motion at 19-21.  ITD's second cause of action alleges that: (1) Oracle breached various

26  agreements with ITD, and (2) breached an agreement with Verizon relating to the Content Delivery

27  System project ("CDS Project").  ECF No. 1-1, ¶ 150-51.  ITD contends that it has standing to raise

28

27

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    the CDS claim because it was a third-party beneficiary to the agreement. *Id.*, ¶ 151. The Court

2    addresses ITD's third party beneficiary claim first.

3                              **1. ITD's Third Party Claim**

4            ITD's third-party beneficiary claim relating to the CDS project is based on language in the

5    contract between Sun and Verizon ("CDS Agreement") requiring Sun to "engage the services of

6    Certified [Minority-Owned, Women-Owned, or Disabled Veteran-Owned Business Enterprise

7    ("MWDVBE")] Suppliers for an amount equivalent [to] at least eighteen percent (18%) of the

8    dollars spent under th[e] Agreement". Friedman Decl. Ex. 17 at Ex. E; Opposition at 21. ITD

9    contends that Sun and Verizon always contemplated that ITD would be the diversity supplier and

10   that, accordingly, ITD suffered damage when Sun breached the CDS Agreement. Opposition at 21.

11           California Civil Code Section 1559 permits a third party to enforce "[a] contract, made

12   expressly for [his] benefit…." In order to pursue a claim under Section 1559, the third party must

13   have been an intended, as opposed to an incidental, beneficiary of the contract. *Hammes Co.*

14   *Healthcare, LLC v. Tri-City Healthcare Dist.*, 801 F. Supp. 2d 1023, 1032 (S.D. Cal. 2011). A

15   third party is an intended beneficiary if "the terms of the contract necessarily require the promisor

16   to confer a benefit on [the] third person." *Id.* It is not necessary that "[the] person… be named or

17   identified individually…." *Id.* It is enough that the third person be "a member of a class of

18   persons for whose benefit it was made." *Id.* In determining intent of the parties, the Court may

19   look beyond the written agreement and consider "the circumstances under which it was entered."

20   *Id.* While, intent is ordinarily "a question of fact… where the issue can be answered by

21   interpreting the contract as a whole and doing so in light of the uncontradicted evidence of the

22   circumstances and negotiations of the parties in making the contract, the issue becomes one of law"

23   and may be resolved on summary judgment. *Id.*

24           ITD's claim fails because ITD was not an intended beneficiary. While it is true that ITD

25   was selected as the diversity supplier before the CDS Agreement was executed (*see e.g.* Wagner

26   Decl., Ex. L (Morrison Dep. Tr.) at 112:4-5), the evidence shows that the parties did not include

27   the diversity supplier provision for the purpose of benefitting ITD or any other diversity supplier.

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    Rather, this provision was included because it would be "advantageous" to Verizon.  Friedman

2    Decl. Ex. 11 (Morrison Dep. Tr.) at 95:6-7; *see also* Wagner Decl., Ex. L (Morrison Dep. Tr.) at

3    135:17-19 (stating that the diverse supplier provision was a Verizon requirement).  Specifically, by

4    requiring Sun to use a diversity supplier, Verizon would become eligible for "diversity credits" and

5    enhance its standing with the federal government.  Friedman Decl., Ex. 70 at 122:7-16, 48:20-22.

6         ITD's reliance on *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th

7    1004, 1022 (2009), is misplaced.  Opposition at 23.  In *Spinks*, defendant landlord sought summary

8    judgment against plaintiff on her breach of contract claim, which was based on a lease agreement

9    the landlord had executed with plaintiff's employer.  *Id.*, 171 Cal. App. 4th at 1018.  Defendant

10   argued that plaintiff could not pursue her claim because she was neither a party to the lease, nor a

11   third-party beneficiary.  *Id.*  The Court disagreed, holding that there was a triable issue of material

12   fact as to whether plaintiff was an intended third party beneficiary.  *Id.* at 1030.  In reaching this

13   conclusion, the Court relied upon the fact that the "core purpose" of the agreement was to provide

14   plaintiff the "benefit of occupancy."  *Id.* at 1027.

15        Here, in contrast to *Spinks*, the core purpose of the diversity supplier provision was to

16   benefit Verizon by making it eligible to receive diversity credits, and not to benefit the diversity

17   supplier selected to perform the work.  Any benefit to ITD was, therefore, incidental.  Accordingly,

18   the Court concludes that ITD was not an intended beneficiary.

19        For the reasons set forth above, the Court grants Oracle's motion for summary judgment on

20   ITD's third party breach of contract claim.

21                    **2. ITD's Remaining Breach of Contract Claims**

22        In addition to alleging a third party beneficiary claim based on Oracle's purported breach of

23   the CDS Agreement, ITD's second cause of action alleges a number of breaches of the Sun

24   Agreement by Sun/Oracle.  Compl., ECF No. 1-1, ¶ 150.  ITD also alleges that Oracle breached:

25   (1) an agreement to provide ITD with "integration" work worth approximately $60 to $80 million

26   per year, and (2) an agreement to repurchase or otherwise compensate ITD for "Last Time Buy"

27   inventory ITD purchased for resale to Motorola.  *Id.*, ¶¶ 115-129, 150.

28

29

1    Oracle contends that ITD's breach of contract claims based on its agreements with

2  Sun/Oracle must fail because ITD materially breached the Sun Agreement by "fail[ing] to pay

3  Oracle over $19 million for outstanding invoices."  Motion at 21.  The Court agrees with respect to

4  ITD's claims based on the Sun Agreement.  However, the Court disagrees with respect to ITD's

5  claims based on the integration and Last Time Buy agreements.

6    It is axiomatic that a plaintiff who has himself materially breached or failed to perform a

7  contract may not pursue a breach of contract action against the other party to the agreement.  *See*

8  *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1006 (9th Cir. 2005) (holding plaintiff could not compel

9  defendant "to honor an arbitration agreement of which it is itself in material breach"); *Id.* at 1010

10  ("A bedrock principle of California contract law is that "[h]e who seeks to enforce a contract must

11  show that he has complied with the conditions and agreements of the contract on his part to be

12  performed."); *Transcription Commc'ns Corp. v. John Muir Health*, No. C 08-4418 TEH, 2009 WL

13  666943, at *5 (N.D. Cal. Mar. 13, 2009) ("The elements of a breach of contract suit in California

14  [include]…. plaintiff's performance or excuse for nonperformance….").

15    In its Opposition, ITD does not contest the fact that it failed to pay Oracle for millions of

16  dollars in product which it purchased under the parties' agreement.  ITD is, therefore, in material

17  breach of the Sun Agreement.  Accordingly, ITD cannot pursue a breach of contract claim against

18  Oracle based on the Sun Agreement.  *See Brown*, 430 F.3d at 1006.

19    ITD argues that, notwithstanding its breach of the Sun Agreement, it should still be

20  permitted to bring breach of contract claims based on this agreement because its claims are based,

21  in part, on conduct that predates the payment issues.  The only example ITD gives of such conduct

22  is Oracle's alleged failure to "quote and process orders for ITD within a commercially reasonable

23  amount of time," and ITD does not identify any evidence showing this conduct occurred.  *See*

24  Opposition at 24 (quoting Complaint, ECF No. 1-1, ¶ 150).  Moreover, ITD fails to cite a single

25  case for the proposition that a plaintiff who has failed to perform its portion of a contract may

26  nevertheless pursue a breach of contract claim based on breaches by the defendant that predate

27

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    plaintiff's own nonperformance.  Accordingly, this argument fails.  For these reasons, ITD's

2    breach of contract claim fails to the extent it is based on Oracle's breach of the Sun Agreement.

3        In contrast, ITD's integration agreement and Last Time Buy inventory claims are not based

4    on the Sun Agreement.  Oracle has offered no legal authority for the proposition that ITD's breach

5    of the Sun Agreement precludes ITD from bringing breach of contract claims based on the Last

6    Time Buy and integration agreements, which the Court understands were distinct from the Sun

7    Agreement.  Accordingly, the Court cannot conclude ITD's claims based on the integration

8    agreement and the Last Time Buy agreement fail as a matter of law.

9        Oracle offers an additional basis for granting summary judgment with respect to the Last

10   Time Buy claim.  Specifically, Oracle contends that this claim should be dismissed because ITD

11   failed to adduce any evidence of an agreement.[7]  Motion at 21.  As set forth in the Complaint, ITD

12   alleges there was an "oral agreement" between the parties that ITD would purchase certain soon-to-

13   be-discontinued ("Last Time Buy") inventory for resale to Motorola and that Sun would repurchase

14   this inventory if Motorola failed to purchase it.  *See* Opposition at 24; Compl., ECF No. 1-1, ¶¶

15   115-23, 150.  ITD additionally alleges that, after Sun failed to repurchase from ITD approximately

16   $6 million of this Last Time Buy inventory, Sun promised that it would provide ITD a greater

17   discount on future purchases to help ITD recoup its losses.  *See* Opposition at 24; Compl., ECF No.

18   1-1, ¶¶ 115-23, 150.  Oracle contends that these agreements are fictitious.  Motion at 21.

19       The Court agrees that ITD has failed to adduce sufficient evidence of an agreement to

20   repurchase the Last Time Buy inventory.  *See* Friedman Decl., Ex. 9 (Huber Dep. Tr.) at 162:21-24

21   (stating that he was not aware of any contractual commitment by Sun to repurchase the Last Time

22   Buy inventory if Motorola did not buy it).  However, ITD has presented sufficient evidence of a

23   promise by Oracle to help ITD recoup its losses from the $6 million in inventory ITD was unable

24   to sell to Motorola.  Specifically, in an August 2009 email from Donald Bunker of Sun to Jim

---

[7] In the Motion, it is somewhat unclear whether Oracle's argument regarding the non-existence of
an agreement concerning the Last Time Buy inventory is meant to address ITD's breach of contract
claim or its promissory estoppel claim (which is also based on the Last Time Buy agreement).  *See*
Motion at 21.  Oracle clarified at the August 23, 2012 hearing that this argument pertains to both
claims.

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    Spinella of ITD, Mr. Bunker states that Sun agreed to provide ITD with additional discounts to be

2    used "towards funding the [Last Time Buy] inventory that Motorola will not be purchasing…."

3    Wagner Decl., Ex. E at ITDIST0002058.  Mr. Bunker further states that these discounts would

4    continue "until the $6M USD of inventory [has] been funded for ITD."  *Id.* at ITDIST0002058.

5    Accordingly, the Court is unable to conclude as a matter of law that there was no agreement with

6    respect to the Last Time Buy inventory.

7        For the reasons set forth above, the Court grants Oracle's motion for summary judgment as

8    to ITD's breach of contract claims based on the Sun Agreement and denies Oracle's motion for

9    summary judgment as to ITD's claims based on the integration agreement and Last Time Buy

10   inventory agreement.

11        **B.  ITD's Breach of the Covenant of Good Faith and Fair Dealing Claim**

12       Oracle also seeks summary judgment on ITD's third cause of action for breach of the

13   covenant of good faith and fair dealing on the grounds that ITD materially breached its agreement

14   with Sun by failing to pay millions of dollars in outstanding invoices.

15       The implied covenant of good faith and fair dealing prohibits "one contracting party from

16   unfairly frustrating the other party's right to receive the benefits of the agreement actually made."

17   *Transcription Commc'ns Corp.*, 2009 WL 666943, at *7 (emphasis omitted).   Like a breach of

18   contract claim, a claim for a breach of the implied covenant of good faith and fair dealing is barred

19   where the plaintiff has failed to perform under the contract and does not have an excuse for such

20   failure.  *Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (2010).

21        Here, ITD's breach of the covenant of good faith and fair dealing claim is based entirely on

22   the Sun Agreement.  Compl., ECF No. 1-1, ¶¶ 154-57.  As set forth *supra* in Section III(C)(2), ITD

23   breached this agreement by failing to pay millions of dollars in outstanding invoices.  Accordingly,

24   ITD's breach of the covenant of good faith and fair dealing claim fails as a matter of law.  *See*

25   *Durrell*, 183 Cal. App. 4th at 1369 (dismissing good faith and fair dealing claim because plaintiff

26   failed to "adequately plead[] an excuse for his nonperformance").

27

28

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    For the reasons set forth above, the Court grants motion for summary judgment as to ITD's

2    third cause of action for breach of the covenant of good faith and fair dealing.

3                            **C. ITD's Promissory Estoppel Claim**

4    Oracle also moves for summary judgment on ITD's sixth cause of action for promissory

5    estoppel.  ITD's promissory estoppel claim alleges that Oracle broke promises that it would: (1)

6    "send ITD integration work upon [ITD's] completion of an integration facility"; (2) "renew the Sun

7    Agreement or enter into a new contract containing similar business terms"; and (3) "reimburse ITD

8    for its purchase of the Motorola 'Last Time Buy' inventory."  Compl., ECF No. 1-1, ¶ 171.

9    "Promissory estoppel applies whenever a promise which the promissor should reasonably

10   expect to induce action or forbearance on the part of the promisee or a third person and which does

11   induce such action or forbearance would result in an injustice if the promise were not enforced."

12   *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185, 81 Cal. Rptr. 2d 39 (1998) (internal quotation

13   marks and citations omitted).  "To be binding, the promise must be clear and unambiguous."  *Id.*

14   Oracle contends that ITD's promissory estoppel claim, like its breach of contract and

15   breach of the covenant of good faith and fair dealing claims, is barred because ITD materially

16   breached the Sun Agreement by failing to pay Oracle millions of dollars in outstanding invoices.

17   Motion at 21.  Moreover, with respect to the Last Time Buy inventory, Oracle contends that Sun

18   never promised to reimburse ITD for the "Last Time Buy" inventory.  *Id.*

19   Oracle's arguments fail.  First, Oracle fails to cite, and the Court is unaware of, any

20   authority for the proposition that a promissory estoppel claim is barred by a plaintiff's material

21   breach of a related contract.  Second, with respect to the Last Time Buy inventory, as set forth

22   *supra* in Section III(C)(2), there is evidence of the existence of an agreement concerning this

23   inventory.  Accordingly, the Court denies Oracle's motion for summary judgment as to ITD's

24   promissory estoppel claim.[8]

25

26

27   ───────────────
     [8] At the August 23, 2012 hearing, counsel for Oracle argued that the promissory estoppel claims
     should be dismissed because there was no promise to provide integration business as alleged in the

28   complaint.  This argument was not briefed.  Accordingly, the Court declines to address it.

                                                    33

### D.  Tortious Interference Claims

Oracle argues that ITD's fourth cause of action for intentional interference with contract and fifth cause of action for tortious interference with a prospective economic advantage fail because ITD's own actions caused its relationships with its customers to deteriorate.  *See* Motion at 22.  Oracle also notes that "ITD has failed to pursue discovery from any of the prospective customers with whom ITD alleges it had a reasonable expectation of a future economic benefit." *Id.*  In its Opposition, ITD addresses these claims only in passing.  Opposition at 23-24 (stating that ITD's tortious interference claim "is predicated on Oracle's termination of ITD and taking direct the customers that ITD supplied").

The elements of an intentional interference with contract claim are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Bauer v. Interpublic Group of Companies, Inc.*, 255 F. Supp. 2d 1086, at 1094 (N.D. Cal. 2003).  Here, ITD does not identify the contracts or customers with which Oracle interfered, nor does ITD point to specific evidence in the record showing actual breach or disruption of that contract or identify ITD's damages.  Accordingly, ITD's claim fails.

ITD's claim for intentional interference with a prospective economic advantage similarly fails.  To state a claim for intentional interference with prospective economic advantage, a plaintiff must prove: (1) the reasonable probability of a business opportunity, (2) the intentional interference by defendant with that opportunity, (3) proximate causation, and (4) damages.  *Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001) (internal quotations omitted).  Here, ITD does not identify the specific business opportunities it lost, nor does it direct the Court to any of the evidence supporting this claim.  ITD has, therefore, failed to show the existence of a genuine issue of material fact with respect to this claim.  *See id.* (upholding the district court's grant of summary judgment in favor of defendant on tortious interference claim where plaintiff "failed to present evidence demonstrating that [it] had a reasonable expectation of continuing as the Fund's investment adviser").

Case No.: 5:11-CV-01043-LHK and related case 11-CV-02135-LHK
CORRECTED ORDER GRANTING IN PART AND DENYING IN PART ORACLE AMERICA INC.'S MOTION
FOR SUMMARY JUDGMENT

For the reasons set forth above, Oracle's motion for summary judgment is granted as to ITD's fourth cause of action for intentional interference with contract and fifth cause of action for tortious interference with a prospective economic advantage.

### E.  Oracle's Affirmative Claims

Oracle also seeks summary judgment on its affirmative claims for: (1) breach of contract, (2) account stated, and (3) goods sold and delivered.  Oracle contends that summary judgment is appropriate with respect to these claims because ITD does not (and cannot) dispute that it owes $19.1 million to Oracle for products that Oracle delivered.  Motion at 22.

In ITD's interrogatory responses, ITD admitted that it owes Oracle $18,121,140 of the $19,103,621 million at issue.  Opposition at 24; *see also* Friedman Decl., Ex. 2 at No. 10; Ex. 5 at 53:21-24; Ex. 13 at 222:8-223:6.  With respect to the $982,481 difference, ITD argues in its Opposition that ITD was entitled to discounts totaling $982,481.  Opposition at 25.  ITD also argues that Oracle should not be granted summary judgment on the $18,121,140 because ITD has a setoff defense based on any judgment in its favor on its affirmative claims.  *Id.* at 24.

At the August 23, 2012 hearing on Oracle's motion for summary judgment, the Court indicated that it was likely to rule in Oracle's favor with respect to the $18,121,140 and ITD acknowledged that ITD owed this amount.  With respect to the remaining $982,481, the Court ordered the parties to meet and confer to see if a resolution could be reached regarding the disputed amount.  As to ITD's setoff argument, the Court indicated that it was likely to rule that the possibility of a setoff defense does not preclude the Court from granting summary judgment.  *See Electroglas, Inc. v. Dynatex Corp.*, 473 F. Supp. 1167, 1171 (N.D. Cal. 1979) ("An offset may ultimately diminish, but does not defeat, Regan's recovery and hence does not preclude resolution of the contract claim at this stage of the litigation.").

Following the August 23 hearing, the parties met and conferred regarding the disputed $982,481.  ECF No. 182.  Subsequently, on September 4, 2012, the parties filed a stipulation in which the parties agreed that judgment should be entered in favor of Oracle on each of Oracle's affirmative claims, in the amount of $19,103,621.  *Id.* at 1.  The parties also agreed that "[t]he

**United States District Court**
For the Northern District of California

35

United States District Court
For the Northern District of California

1  Court shall stay execution of the judgment until after the conclusion of the trial" in this matter.  *Id.*

2  The Court entered an order adopting the parties' stipulation on September 17, 2012.  ECF No. 201.

3         In light of this Court's September 17 order adopting the parties' stipulation concerning the

4  $19,103,621, Oracle's motion for summary judgment is denied as moot with respect to Oracle's

5  affirmative claims.

6  **V.     CONCLUSION**

7         For the reasons discussed above, the Court GRANTS Oracle's motion for summary

8  judgment as to: (1) ITD's second cause of action for breach of contract to the extent it is based on

9  Oracle's breach of the CDS Agreement; (2) ITD's second cause of action to the extent it is based

10  on Oracle's breach of the Sun Agreement; (3) ITD's third cause of action for breach of the

11  covenant of good faith and fair dealing; (4) ITD's fourth cause of action for intentional interference

12  with contract; and (5) ITD's fifth cause of action for tortious interference with prospective

13  economic advantage.

14         The Court DENIES Oracle's motion for summary judgment as to: (1) ITD's first cause of

15  action for a violation of the NJFPA, (2) ITD's second cause of action to the extent this claim is

16  based on breaches of the integration agreement and Last Time Buy agreement, and (3) ITD's sixth

17  cause of action for promissory estoppel.

18         The Court DENIES AS MOOT Oracle's motion for summary judgment on Oracle's: (1)

19  first cause of action for breach of contract; (2) second cause of action for account stated; and (3)

20  third cause of action for goods sold and delivered.

21

22  **IT IS SO ORDERED.**

23  Dated: September 18, 2012                        *Lucy H. Koh*
                                                      _____
24                                                    LUCY H. KOH
                                                      United States District Judge
25

26

27

28
                                                36